In the matter of the propounding for probate of a paper writing, purporting to be the last will of ANN JANE ANDREWS, deceased, late of Jersey City.

1. The testamentary capacity of a testatrix who executed her will in the later stages of pulmonary consumption, established against the hypothetical opinions of experts as to the effect, upon the mind, of the medicines usually employed in such cases.

2. The charge of undue influence exerted on testatrix by her mother, her sole legatee and executrix, held not to be sustained, it appearing that testatrix had been obliged, by her husband's cruelty, to leave him and return to her parent's house; and that testatrix also desired her mother to have the care and custody of her infant, in preference to its father.

THE ORDINARY.

On the 6th of August, 1878, Mrs. Ann Jane Andrews, now deceased, then the wife of James B. Andrews, of Jersey City, executed an instrument of writing as her last will and testament, in the presence of Rev. Fernando C. Putnam, the pastor of the church she attended when in health, Edward D. Gillmore, esq., the lawyer employed to draw the will, and Mrs. Mary T. Chamberlain, a neighbor and acquaintance of the testatrix, as testamentary witnesses. Three days previous to the making of the will, the testatrix, who was ill of pulmonary consumption, left her husband's house, which adjoined that of her father, Isaac Cordukes, and went to the latter house, and she remained there until she died, which was on the 26th day of August, 1878, twenty days after the making of the will.

The will was executed at her father's house, and with all due legal formalities; and the testamentary witnesses all testify to her capacity.   By the will, she gave all her property to her mother, whom she constituted executrix.   The testatrix was the second wife of Mr. Andrews, to whom she was married on the 1st of June, 1876.   By him she had one child, a boy, born in September, 1877.   Her property was never of large amount.   She appears to have had about $1,000, which were given to her by her relatives when she was married; $500 of which were in cash (afterwards invested in a bond), given to her by her uncle Thomas, and $500 in a bond, a present from her aunt, whose namesake she was.   She had, also, a pair of diamond ear-rings, given to her by her uncle Jonathan, and a piano-forte, the gift of her mother.   Besides these things she had a few trinkets and her wearing apparel.   All the jewelry that she had received from her husband, she returned to him after she left his house, with the exception of one little ring; so that the property which, by her will, she gave to her mother, had all been received from her own family.   Mr. Gillmore testifies in regard to the execution of the instrument, that the paper was signed on the 6th of August, 1878; that there were present the testatrix, Mr. Putnam, Mrs. Chamberlain and himself; that the testatrix was sitting in a chair near the bed; that he read the will to her and she signed it, the seal being on already; that he asked her whether she signed, sealed, published and declared it to be her last will and testament, and she answered that she did, and that he then asked her whether she requested Mr. Putnam and himself and Mrs. Chamberlain to sign as witnesses, and she answered that she did so request them.   He further says that then Mr. Putnam signed his name as a witness, he, Mr. Gillmore, signed his, and Mrs. Chamberlain hers.   He further says that the testatrix signed her name in the presence of these three witnesses; that they were present when he asked her whether she signed, sealed, published and declared it to be her last will and testament, and when she answered that she did, and that they were present when she requested them to sign as witnesses, and signed in the presence of each other and in her presence.   He says, speaking on the

subject of her capacity, that she seemed to understand clearly what she was doing, and after the will was executed, asked him whether her husband could keep or get (he says he forgets which expression she used) her property after that.   Mr. Putnam says she seemed perfectly to understand the will she was executing, and the nature of the act she was performing; and Mrs. Chamberlain testifies to the same effect.   Mr. Gillmore drew the will, and he testifies on the subject of his instructions for it, which he received from the testatrix.   He says she inquired of him whether she could leave her property so that her husband would not get it, or could not keep it, and he told her he thought she could, and promised to draw the will.   He says she spoke to him about her bonds, and said her husband had them; that he asked her if they had been converted into cash, and she said it was not by her consent that her husband had appropriated those bonds to his own use.   He says she spoke also of the piano-forte, and said it was a wedding present.   Mr. Gillmore also testifies that she spoke to him in reference to her child, and asked him if she could keep it; and he told her he thought she could, as long as she stayed at her father's house.   A few days after that her husband began proceedings, by *habeas corpus*, to obtain the custody of the child.

The contestant is Mr. Andrews, and he resists the admission of the paper to probate as the will of his wife, on the ground of incompetency and undue influence on the part of her mother, her legatee and executrix.   To the testimony of the testamentary witnesses, he opposes that of several physicians produced by him as experts in reference to the effect of the disease of the testatrix and the medicines administered (which were the usual palliatives and alteratives given in like cases), on the mind of the patient. As was to have been expected, their testimony is by no means of a decisive character.   Indeed, it is of but little, if any, service in the judicial inquiry.   To their hypothetical deductions is opposed the reality of the case in hand.   In opposition to their conclusions as to what, on their hypotheses, the mental condition of the patient in the suppositional case should be, is the fact of what the mental condition of the patient, in the actual case, was.

It is worthy of remark in this connection, that Dr. J. D. McGill and Dr. Theodore R. Varick, called as experts on the part of the proponent, testify to the fact which may be said to be within common observation, also, that the mind of a person ill of pulmonary consumption is but little, if any, affected by the progress of the disease or the medicines usually administered in such cases. Dr. Varick, to the question whether, in his judgment, there is anything in the presence of the ordinary symptoms of consumption of the lungs, together with such treatment as was given in the case in hand, to impair the patient's mind, so as to prevent him or her from doing ordinary business, answers, "Not at all; as a rule, the intellect remains intact. In my experience [referring to consumptive patients], the intellect has remained intact up to the last." And here it should be stated that Dr. Culver, Mrs. Andrews's physician, says not only that the testatrix had as much intelligence as an ordinary consumptive in her stage of the disease, but that she was one of those persons who could marshal their forces, and that she could do as much, perhaps, under the same conditions, as any one. When asked whether he would say that consumptives, as weak as she was on the day the will was made, and taking the same opiates which she then took, would be incapable of making a will, he answers in the negative, and, afterwards, says he does not think she was incapable of making a will. In the case under consideration, there is no evidence of any want of mental capacity on the part of the testatrix; but, on the other hand, the proof is clearly to the contrary.

The contestant insists, however, as before stated, that the testatrix was induced to make the will through undue influence, which he attributes to her mother, and perhaps the other members of her father's family, and other persons who were with her in her latter days. It is not necessary to consider at any length the testimony which has been adduced on the subject. Out of the great mass of it, a few decisive facts are deducible. The testatrix had left her husband's house because of his ill treatment of her before she left it in August, 1878. In October, 1877, she left him and went to her father's, giving as her reason that he had treated her cruelly, and abused and hurt her physically,

and she was at that time desirous of obtaining a permanent separation from him on that account, and consulted counsel with a view to taking measures to that end, but returned to him on his promising that he would endeavor to be a better man and a better husband. On that occasion she was away from him for several days. The evidence is that the violence of which she complained was two blows which he struck her on the head .with his fist, because, as he alleged, she had neglected to feed his horse. She left him again the 3d of August, 1878, as before mentioned. The cause of her leaving on that occasion was, as before, his unkind treatment of her. He was given to frequent and gross intoxication, and on such occasions was rude and violent towards her. In her condition of health, his treatment became insufferable. He was at war with her family, and ordered her mother out of his house, and finally, violently put her out of the room where she was with his wife. It is proved that on one occasion when he was drunk he came into the room and sat down on his wife's bed, and in so doing hurt her by sitting on her legs. She upbraided him for it, saying that he would kill her, or that she would die, to which he replied by saying, " Die and be damned." His language, was on some of those occasions, violent, abusive, profane and blasphemous. He made false and unfounded charges (even of criminal conduct) against her friends. He was frequently brought home in a state of extreme intoxication, to her great annoyance. Not one alone, but many witnesses testify to this conduct on his part, and he opposes to it practically nothing but his own bare denial. His testimony bears frequent internal evidence of its unreliableness, and the spirit in which it is given, and which throughout pervades it, makes it painfully apparent that he is actuated in this litigation by a desire to do as much injury as possible by means of it to his father-in-law's family, and that too, without regard to the memory of the testatrix. Irrespective of all other considerations, the weight of evidence is entirely against him. The estate for which this litigation, so great in its proportions, is carried on by him in such an inordinate manner, is of but small value, comparatively, at most. His wife's property at her death, according to

Andrews's Case.

his claim, did not include the bonds or the piano, and consisted only of her wearing apparel and her diamond earrings and some trinkets. On taking out letters of administration upon her estate, he gave bond in the sum of $2500, but appears to have regarded that as much beyond what the value of the estate would reasonably require. One of the bonds he swears he converted into money, with his wife's consent, in her lifetime, and handed her the money, and he says she spent it in household expenses, and he claims to be the owner of the other by gift from her. He says she transferred the piano also to him, and that she therefore did not own it when she died. And here it may be remarked, as bearing upon his disposition in this litigation, that when he applied for the letters of administration he made oath, though he knew of the existence of the will, that his wife died without a will, as far as he knew and as he verily believed.

On the argument much stress was laid by his counsel on the fact that by the will the testatrix makes no provision for her infant child, but it is proved that she desired that the child, which was less than a year old, should be delivered to her mother, and it appears by her husband's own testimony that but a very short time before her death, when he asked her if there was anything that she wanted him to do, she, after telling him that she wished to be buried near her brother, desired of him that her mother might be allowed to keep the child, and he says he refused the request, saying that that could not be. Thus with her dying breath she declared her wish that her mother should have charge of her child. But it is further in proof that she said previously, on the subject of the support of the child, that her husband was able to provide for it, as in fact he was, and is. Irrespective, however, of all this, the amount and character of her property was not such as, under the circumstances, to lend aid to the opposition to the will from the consideration of its unnaturalness. That there was hostility between her family and her husband is beyond question, but it seems to have been occasioned, to a very great extent at least, by his treatment of her. It is equally clear that when the testatrix last left her husband, she

was full of indignation against him, because of his conduct towards her, and that from that time she was not only not desirous of seeing him again, but was unwilling to do so. He had by his conduct wholly estranged her from him, and of her own accord she sought by means of her will to give to her mother, who she hoped might be permitted to take care of her child, whatever property she had, all of which had been derived from her own relatives, and none of it, except it may be some wearing apparel, from her husband.

The will will be admitted to probate, and the caveator will be required to pay the cost of the litigation.